[No. 21619–8–I.   Division One.   September 5, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID
JOHN RAINES, *Appellant.*

*Andrew Peter Zinner* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lynn Moberly, Deputy,* for respondent.

[As amended by order of the Court of Appeals September 18, 1989.]

SCHOLFIELD, J.—David Raines appeals his convictions on two counts of violating the Uniform Controlled Substances Act. Raines claims that the convictions were based on illegally seized evidence. We affirm Raines' conviction on count 1 and reverse his conviction on count 3. The State properly concedes error regarding admission of evidence supporting the third count pursuant to *State v. Boyce,* 52 Wn. App. 274, 758 P.2d 1017 (1988). We therefore address only admissibility of evidence supporting the first count.

On July 20, 1987, at about 10:30 p.m., Deborah Feldhusen called Kent police to report a domestic dispute in Claudine Looney's apartment. Feldhusen reported that Raines was involved in the dispute, that the fighting was intense, and that she heard Looney yelling, telling Raines not to hit her 7–year–old son.

When police officers arrived, Feldhusen again reported what she had overheard. The officers, Kullberg and Boone, were familiar with Looney and Raines, having responded to prior reports of domestic violence involving them. The officers knew from these incidents that Raines had a violent temper and that Looney had previously been extremely inconsistent, telling officers at one moment that there was no problem and then reversing herself moments later.

When Kullberg arrived at the scene, she saw a man peering out a window in Looney's apartment. Neither officer heard any disturbance as they approached the apartment. The officers knocked at the door and Looney answered. Looney told the officers there was no problem. When Kullberg asked to speak with Raines, Looney stated that Raines was not there and persisted in denying any problem existed. Kullberg asked if they could enter the apartment. Looney did not object, but stepped back, as if gesturing to the officers to enter.

Upon entering the apartment, Kullberg saw Looney's child standing in the front room, apparently unharmed. Looney walked immediately to an interior door and closed it, stating that it was her room and there was nothing inside. Kullberg said she believed Raines was in the room and that she was going to investigate. Looney did not object. Kullberg opened the door and entered the room, where she found Raines hiding.

While in the room, Kullberg saw a substance which she believed was cocaine. Acting on this suspicion, the officers arrested Raines and searched the apartment, uncovering more cocaine and drug paraphernalia. Based on this evidence, the State charged Raines with one count of possessing cocaine. The trial court denied Raines' motion to suppress the evidence. Raines was convicted and now appeals the trial court's conclusion that the evidence was properly seized.

Raines contends that the officers' initial entry into Looney's apartment was not consensual; that mere acquiescence in the face of a show of authority, after repeated demands to be allowed entry, is not consent for purposes of justifying a warrantless search. Further, Raines asserts that entry into Looney's bedroom, after Looney closed the door leading to the room, was clearly not consensual.

Raines' contentions recognize that two entries are at issue: the officers' initial entry into the apartment and Officer Kullberg's subsequent entry into the bedroom. The trial

court concluded that Looney's consent and exigent circumstances justified the former, and that exigent circumstances supported the latter. We agree.

## Consent To Enter and Search

██ ██ A warrantless search of a home is constitutional when the householder voluntarily consents. *State v. Hashman,* 46 Wn. App. 211, 214, 729 P.2d 651 (1986), *review denied,* 108 Wn.2d 1021 (1987). Whether consent to search was voluntary, and thus valid, or was "the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973) (quoted in *State v. Jensen,* 44 Wn. App. 485, 488, 723 P.2d 443, *review denied,* 107 Wn.2d 1012 (1986)). If a householder is in a position to communicate refusal of admittance, and circumstances surrounding the warrantless entry "are such that [police officers] can reasonably conclude [they are] not being refused entry, then no invitation, express or implied, is necessary to make the [officers'] entry lawful." *State v. Sabbot,* 16 Wn. App. 929, 937–38, 561 P.2d 212 (1977).

When Officers Kullberg and Boone arrived at Looney's apartment, they requested permission to enter "to look around". Looney made no objection, but stepped aside as if to allow them to enter. This affirmative act in response to a request to enter amounted to more than mere acquiescence to entry. Looney was in a position to communicate an objection to the officers' entry if the officers misunderstood her affirmative gesture. Looney's failure to expressly object to the officers' entry in these circumstances amounted to an implied waiver of her right to exclude them.

Raines does not offer an alternative interpretation of Looney's act, but argues, in substance, that her consent was coerced. The circumstances surrounding the officers' request to enter and "look around", however, do not indicate the type of coercion that would vitiate Looney's voluntary consent. *See Bumper v. North Carolina,* 391 U.S. 543,

549–50, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968); 3 W. LaFave, *Search and Seizure* § 8.2(b) (2d ed. 1987). We therefore agree with the trial court's conclusion that the officers' initial entry of the apartment was consensual.

Entry into Looney's bedroom presents a more difficult question. Looney's affirmative act of closing the bedroom door and indicating her desire that the officers not enter arguably limited the scope of her consent to enter the apartment. *See State v. Johnson,* 71 Wn.2d 239, 243, 427 P.2d 705 (1967); 3 W. LaFave, *Search and Seizure* § 8.1(c); Utter, *Survey of Washington Search & Seizure Law: 1988 Update,* 11 U. Puget Sound L. Rev. 411, 556–57 (1988). However, because the trial court did not rely on Looney's consent for its finding that entry into the bedroom was proper, and because we agree with the trial court's conclusion that exigent circumstances justified the entry, we need not reach this issue.

## Exigent Circumstances

Raines contends that exigent circumstances justifying the officers' entering Looney's apartment and bedroom simply did not exist. Raines asserts that the officers observed no signs of a disturbance when they arrived, they detected no evidence of harm or danger to either Looney or her child, and Looney expressly told them no problem existed. Further, if after entering the apartment, the officers were concerned about Looney and the child's safety, they could have guarded them while obtaining a telephonic warrant to search the bedroom.

Although warrantless searches are per se unreasonable, *Katz v. United States,* 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *State v. Chrisman,* 100 Wn.2d 814, 817, 676 P.2d 419 (1984), an emergency situation can justify a search. 2 W. LaFave, *Search and Seizure* § 6.5(b)–(d), at 656–85 (2d ed. 1987). For instance, when premises contain persons in imminent danger of death or harm or information that will disclose the location of a threatened victim or

the existence of such threat, police may search those premises without first obtaining a warrant. *State v. Lynd,* 54 Wn. App. 18, 20, 771 P.2d 770 (1989).

■ For a search to come within the emergency exception, we must find that the search was "actually motivated by a perceived need to render aid or assistance." *State v. Loewen,* 97 Wn.2d 562, 568, 647 P.2d 489 (1982). Accordingly, the State must show that: (1) the searching officer subjectively believed an emergency existed; and (2) a reasonable person in the same circumstances would have thought an emergency existed. *State v. Loewen, supra* at 568; *State v. McAlpin,* 36 Wn. App. 707, 716, 677 P.2d 185, *review denied,* 102 Wn.2d 1011 (1984). We hold that in this case exigent circumstances justified both entries.

The determination of whether an emergency justifies a warrantless search must be based on the individual facts of each case. *State v. Lynd, supra* at 22. "Whether a police officer's acts in the face of a perceived emergency were objectively reasonable is a matter to be evaluated in relation to the scene as it reasonably appeared to the officer at the time". *Lynd,* at 22 (citing *State v. Bakke,* 44 Wn. App. 830, 837, 723 P.2d 534 (1986), *review denied,* 107 Wn.2d 1033 (1987)).

Here, the evidence establishes that Kullberg and Boone believed they were responding to an emergency. The officers were familiar with Raines' violent tendencies and Looney's penchant to misrepresent the seriousness of domestic situations to protect Raines. Feldhusen had reported that the incident was intensely violent and that she heard Looney plead for her child's safety. Although the dispute had apparently subsided when the officers approached the apartment and Looney insisted that no problem existed, given their past experience with Raines and Looney, there was a basis for the officers to reasonably believe that conditions in the apartment were still volatile. In these circumstances, the officers had a duty to ensure that the child was safe and that conditions in the apartment had returned to a state of normalcy. *See State v.*

*Lynd, supra* at 23. Their initial entry into the apartment, therefore, was reasonable and justified by exigent circumstances.

Kullberg's entry into the bedroom was also justified by exigent circumstances. Recognizing the volatility inherent in domestic disturbances, some jurisdictions permit responding police to "'use all reasonable means to *prevent further abuse.*'" (Italics ours.) *Commonwealth v. Rexach,* 20 Mass. App. Ct. 919, 478 N.E.2d 744, 746, *review denied,* 395 Mass. 1104, 482 N.E.2d 328 (1985). In *Rexach,* officers responding to a report of domestic violence found the wife badly battered and the husband extremely agitated. After the husband agreed to leave the residence, one of the officers followed him from the living room to a bedroom to ensure that he did not obtain a weapon. *Rexach,* at 745. While standing at the bedroom's doorway, the officer spotted illegal drugs in the room. The officers seized the drugs, which were used as evidence to secure the husband's drug–related conviction. On appeal, the husband challenged the legality of the officer's movement from the living area of the house to his bedroom.

The court held the officer's movement to the bedroom was within the scope of the consent given. The court commented further that exigent circumstances justified the officer's actions. The court reasoned that given the officer's duty to protect the wife, his actions were reasonable. *Rexach,* at 746. A more restrictive view, the court cautioned, would defeat the salutary purpose underlying family abuse law. *Rexach,* at 746.

We find the *Rexach* court's reasoning persuasive. Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well–being of the occupants. *State v. Lynd, supra* at 23. Here, Officers Kullberg and Boone had a duty to assure the safety of Looney and the child by ensuring that Raines posed no continuing threat to them. Given the officers' past experience with Looney's efforts to protect Raines, they were not obligated to believe her insistence that no problem

existed. In addition, the fact that the occupants appeared to be unharmed when the officers entered did not guarantee that the disturbance had cooled to the point where their continued safety was assured. Until they had an opportunity to observe Raines and talk to him, they had no knowledge of his condition and state of mind. The officers observed a man at the window when they arrived and could reasonably presume it was Raines. Looney was lying to them about his presence. Why? If all was well, why did Raines deliberately attempt to conceal his presence? Why did he not come forward and assure the officers there was no problem requiring their presence? Police officers are entitled to consider such questions in the process of evaluating a given situation. The officers had obvious reasons to be concerned. Courts should be reluctant to rule after the fact that while there were reasons, they were not sufficient.

Raines does not contend that the police did not have a duty to ensure the continued safety of Looney and the child. Rather, he asserts that if a search of the bedroom was necessary, the officers should have secured the area and sought a telephonic warrant prior to conducting a warrantless search. Raines contends that because neither Looney nor the child were in danger of immediate harm, failure to seek a telephonic warrant was unreasonable.

The procedures Raines suggests would unduly restrict police officers responding to domestic violence incidents in performing their duty to ensure the present and continued safety of the residence's occupants. Availability of a telephonic warrant is merely one factor officers must consider in determining whether circumstances are sufficiently exigent to justify a warrantless search. *See State v. McIntyre*, 39 Wn. App. 1, 5–6, 691 P.2d 587 (1984), *review denied,* 103 Wn.2d 1017 (1985). Given the late hour at which the officers reported to the apartment, a telephonic warrant may not have been readily obtainable. *State v. Stroud,* 106 Wn.2d 144, 166, 720 P.2d 436 (1986) (Durham, J., concurring) (telephonic warrants may be easy to obtain only during normal working hours). We must determine the

reasonableness of the officers' conduct by evaluating the circumstances as they appeared to them at the time. *State v. Lynd, supra* at 22. Given the officers' awareness of Raines' presence in the apartment and his violent propensities, and that Raines had apparently threatened the child, we hold that the officers were justified in proceeding as far as reasonably necessary to ensure that Raines posed no present or continuing threat to Looney or the child. A more restrictive holding would defeat the salutary purpose of our domestic violence law.

Judgment on count 1 is affirmed, reversed on count 3.

PEKELIS, J., concurs.

WINSOR, J. (dissenting)—I agree with the majority that there was sufficient consent to enter the apartment. I disagree, however, with the conclusion that exigent circumstances justified further entry into the bedroom. I therefore reach the issue whether there was consent to enter the bedroom and concur with the majority's intimation that there was no such consent.

First, as to consent to enter the bedroom, as the majority points out, Looney affirmatively closed the bedroom door and indicated that she did not want the officers to enter. The authorities the majority cites support a holding of no consent.[1] In addition, two opinions from other states are precisely on point. In *State v. Drouhard*, 31 Or. App. 1083, 572 P.2d 331 (1977), officers seeking to secure a house where they had observed drug–related activity did not have a search warrant. The officers knocked on the door, and the defendant called from within, "Come in." The officers entered the living room where the defendant was seated, but then proceeded on into the bedroom and found drugs. Unlike our case, the defendant did not protest at any point. Nonetheless, the court held that permission to enter the

---

[1]*See State v. Johnson,* 71 Wn.2d 239, 243, 427 P.2d 705 (1967); 3 W. LaFave, Search and Seizure § 8.1(c); Utter, *Survey of Washington Search & Seizure Law: 1988 Update,* 11 U. Puget Sound L. Rev. 411, 556–57 (1988). Majority, at 463.

living room did not mean that there was consent to search any other area. The evidence was suppressed.

Likewise, in *State v. Monahan,* 76 Wis. 2d 387, 251 N.W.2d 421 (1977), police were invited by the defendant into his home. The court observed that "[i]mplicit in [such an] invitation is a right to look around." *Monahan,* at 393. However, once in the house, the police were directed by the defendant to go to the den and instructed not to go into the living room. Nevertheless, one of the officers followed the defendant as far as the kitchen and there observed the defendant in the living room with contraband. The court held that an invitation to enter one's home may implicitly extend to all areas of the home or may be limited to specific areas. The evidence was suppressed. In light of Looney's affirmative indication that she did not want the officers to enter her bedroom, I would rule that there was no consent to enter.

As a basis for exigent circumstances justifying entry into the bedroom, the majority states that the police were reasonably concerned for the physical safety of Looney and her child. Some additional facts from the record are required in assessing the reasonableness of the officers' concern. The witness Feldhusen, who made the contact with the police, did report overhearing "fighting," but described the fighting as cussing, throwing things, "that kind of fighting." It is also true that the officers testified that they had received previous calls to break up disputes between Looney and Raines, but when asked whether there had ever been any evidence of someone being hurt as a result of those disturbances, the answer was no. The officers therefore had no reason to anticipate violence of a physical nature. In fact, the manner of Officer Kullberg's entering the bedroom—simply opening the door and walking in—indicates that she did not anticipate a physically violent response from Raines.

Thus, when the police had gained access to the apartment and found that Looney and her child were both unharmed, and that Looney was denying any need for help,

it was unreasonable to proceed further without a warrant. This is especially so with the advent of the telephonic search warrant under CrR 2.3(c). Courts are required to closely scrutinize the totality of the circumstances in determining whether a warrantless search was justified in view of alternatives to either (1) guard the premises while a warrant is sought or (2) apply for a telephonic warrant. *State v. Welker,* 37 Wn. App. 628, 633, 683 P.2d 1110, *review denied,* 102 Wn.2d 1006 (1984). Courts *must* consider the availability of a telephonic warrant in determining whether exigent circumstances exist. *State v. Ringer,* 100 Wn.2d 686, 702, 674 P.2d 1240 (1983), *overruled on other grounds in State v. Stroud,* 106 Wn.2d 144, 150, 720 P.2d 436 (1986).

The majority cites *State v. Lynd,* 54 Wn. App. 18, 22, 771 P.2d 770 (1989) as justifying a warrantless search when the police have concern for imminent danger of death or harm. That case appropriately so holds, but the facts are quite different from the facts presented here. In *Lynd,* the police received a 911 call from the Lynd home, but when the police answered the phone the caller hung up. The patrolman arriving on the scene very soon thereafter found the defendant packing his automobile as if he were leaving. He had a fresh cut on his face and admitted that he had been in a physically violent fight with his wife, that he had pushed her to the floor and slapped her. When the police requested permission to enter his home to assure that she was safe, he claimed that she had already departed. The police were concerned about a delay in possibly seeking a telephonic warrant under the circumstances and so entered without a warrant. Contraband was found. The court upheld the search.

The significant differences in the case are that in *Lynd* someone within the home had initiated a call to police for help, the police had clear evidence of physical violence between the defendant and a victim, and the victim was not present to reassure the police that all was well. Likewise, this case is nothing like *Commonwealth v. Rexach,* 20

Mass. App. Ct. 919, 478 N.E.2d 744, *review denied,* 395 Mass. 1104, 482 N.E.2d 328 (1985), relied upon by the majority. Majority, at 465. There the officers responding to a domestic violence call found the wife badly battered and the husband extremely agitated.

It bears repeating that in our case the police knew that the woman and her child were unharmed, and the woman herself was assuring the police that there was no problem. The police legitimately had a lingering concern, but under all the facts, it clearly was unreasonable to proceed into the bedroom without obtaining a search warrant. I would reverse.

Review denied at 113 Wn.2d 1036 (1990).